# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CHAMPION LABORATORIES, INC.,

               Plaintiff,                       Case Number: 07-12493

v.                                       JUDGE PAUL D. BORMAN
                                         UNITED STATES DISTRICT COURT

PARKER-HANNIFIN CORPORATION,
including its RACOR Division,

               Defendant.

_____ /

## ORDER DENYING IN PART AND GRANTING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Before the Court is Defendant Parker-Hannifin Corporation's Motion for Summary Judgment, filed December 12, 2008. (Doc. No. 17). Parker-Hannifin's Racor Division is the subject of this lawsuit and, therefore, the Court will refer to Defendant Parker-Hannifin as "Racor" as the parties have done in the pleadings. Plaintiff Champion Laboratories, Incorporated, ("Champion") responded to Racor's motion for summary judgment on February 3, 2009. (Doc. No. 35). The Court heard oral arguments on April 15, 2009. For the reasons discussed below, the Court **DENIES IN PART** and **GRANTS IN PART** Racor's motion for summary judgment.

## I. BACKGROUND

      This lawsuit arises out of Champion's claims that Racor disparaged its product, a fuel filter, to General Motors ("GM"), in an effort to recover the GM fuel filter business Racor had previously lost to Champion when Champion produced and sold a substantially similar, but cheaper, version

1

of Racor's Duramax filter to GM.

Both Champion and Racor are automotive suppliers engaged in the business of producing and selling automobile parts to car manufacturers. (Compl. ¶¶ 15, 17). Champion is a Delaware corporation that has its principal place of business in Albion, Illinois. (Compl. ¶ 14). Racor, a division of Parker-Hannifin, is an Ohio corporation that is headquartered in Cleveland, Ohio. (Compl. ¶ 17). Champion and Racor are competitors in the fuel filtration products market. (Compl. ¶ 24).

The product at issue in this case, a fuel filter designed for use in General Motor's 6.2 liter turbo diesel engine called "Duramax," was first designed and manufactured by Racor. (Compl. ¶¶ 27, 32). Racor was GM's designated Original Equipment Manufacturer ("OEM") for the Duramax filter, meaning that Racor manufactured and furnished to GM all the of original fuel filters inserted into the Duramax engine at the factory. (Compl. ¶ 32). Champion obtained a contract with GM's Service Parts Organization ("SPO") to furnish replacement Duramax filters to GM service providers. (Compl. ¶ 33). Initially, Champion fulfilled the aftermarket contract by purchasing filters from Racor and selling the filters to GM. (Compl. ¶ 34).

This arrangement was not very profitable for Champion and, in 2003, Champion began to design its own Duramax filter. (Compl. ¶ 36). In 2005, Champion introduced a prototype version of its Duramax filter; Champion later received a patent for its design. (Compl. ¶¶ 36-37). After extensive testing, SPO approved Champion's filter for use in the Duramax engines. (Compl. ¶ 38). Champion then discontinued buying filters from Racor, and used its own filters to fulfill its aftermarket contract with GM and has also sold the filters to other aftermarket purchasers. (Compl. ¶¶ 39-38). Racor continues to be the OEM supplier of Duramax filters.

2

Shortly after Champion stopped buying filters from Racor, Racor decided to attempt to regain the aftermarket filter business. (Compl. ¶ 40). In January 2007, Robert Sabo, Racor's regional sales manager, was instructed to persuade GM to stop buying aftermarket Duramax filters from Champion. (Pl.'s Resp. Ex. K, Defendant's Written Response to Plaintiff's First Set of Requests for Admission ¶ 33). Racor then went on the offensive, planning an "attack strategy" to recover the aftermarket Duramax filter business. (Pl.'s Resp. Ex. A, Email from Dinges to Sabo, 1/17/07). Racor learned that the only way the GM Powertrain Engineering division, that wanted Racor to supply aftermarket filters, could reverse GM SPO's purchasing decision was if it was shown that Champion's filter did not meet GM's requirements, presented a safety risk or was defective. (Defendant's Written Response to Plaintiff's First Set of Requests for Admission ¶ 32). Racor also learned from Bob Straub, the GM Powertrain Technology Leader, that GM Powertrain Engineering was "extremely concerned" about the Champion filters "in relationship to warranty concerns" because GM had previously paid out at least $100 million in warranty costs to replace fuel injectors in the Duramax engines before the Racor filter was utilized. (Pl.'s Resp. Ex. L, Email from Sabo to Lewis and Dinges, 1/21/07).

Because the only way Racor could recover the business was to show that the Champion filter did not meet GM's requirements, presented a safety risk or was defective, the Racor sales team asked Racor engineers to test the Champion filter for such deficiencies. (Pl.'s Resp. Ex. E, Email from Sabo to Stone, 2/23/07). The Champion filter performed at least equally as well as the Racor filter in all of the usual tests that the Racor engineers ran on the filter. (Pl.'s Resp. Ex. Z, Email from Reiland to Dinges, 2/15/07; Pl.'s Resp. Ex. E. Email from Reiland to Edge, 2/22/07).

Racor engineers then began looking for a test that would show that Racor's filter was better

at filtering out particles smaller than four microns; GM had had many warranty claims in the past due to ultrafine particles, smaller than four microns, passing through the filter and damaging the fuel injectors. (Def.'s Mot. Ex. F, Dinges Dep. 42-43; Def.'s Mot. Ex. D, Email from Stone to Sabo, 2/22/07). The problem became, however, that there was no standard testing method to measure particles smaller than four microns. (Email from Stone to Sabo, 2/22/07). Racor engineer Wally Stone expressed concern to Sabo that testing for two micron sized particles was unprecedented. (Email from Stone to Sabo, 2/22/07). Stone was also concerned that he would not be able to defend the testing procedure. (Email from Stone to Sabo, 2/22/07).

Sabo pressed Stone and Cheryl Reiland, also a Racor engineer, to find a way to test the filters in a manner that would distinguish Racor's filter from Champion's filter. (Def.'s Mot. Ex. D., Email from Stone to Sabo, 2/23/07). Steve Hardison, Racor's Fuel Project Manager, suggested that they use gravimetric testing, which measures the weight of the particles that pass through the filter. (Def.'s Mot. Ex. C, Stone Dep. 53-54). The object of the testing would be to show which filter did a better job of filtering out ultrafine particles. (Stone Dep. 54). After performing the first gravimetric tests, Racor found that there was "1.39 times more dirt in the effluent of the Wix filters or the Racor had 72% of the dirt in the Wix effluent." (Pl.'s Resp. Ex. EE, Email from Stone to Sabo, 3/1/07). Later, Stone emailed Sabo to report that they "got some pretty wild results on the Champion filters," and recommended that Racor refrain from sharing the data with GM until they could "get the whole picture." (Pl.'s Resp. Ex. EE, Email from Stone to Sabo, 3/1/07). In response, Sabo scolded engineering for not getting the data to him sooner but commended Hardison for his hard work, noting that they had also received positive crash and impact testing results now that Hardison was involved. (Pl.'s Resp. Ex. EE, Email from Sabo to Stone, 3/2/07). Sabo also indicated

4

that he would not postpone Racor's meeting with GM, stating "I am going to GM today and I will be presenting the data below along with the other data we have acquired for our arguments." (Email from Sabo to Stone, 3/2/07).

On March 2, 2007, Racor emailed GM its presentation and, on March 7, 2007, Racor gave an on-site presentation. The March 2, 2007, presentation that Racor emailed to GM stated that the filters performed essentially equally in the differential pressure drop, filter efficiency, contamination life and water separation tests. (Pl.'s Resp. Ex. F, General Motors Champion-Racor Technical Comparison, Filter Performance Comparison). Racor differentiated the filters by highlighting the gravimetric testing, in which the Racor filter removed more particles than the Champion filter. (General Motors Champion-Racor Technical Comparison, Filter Performance Comparison). Racor also suggested that the lip seal capture design used in the Champion filter was faulty because the lip seal, "almost always remains in the head, stuck on the spud. It is difficult to remove, especially in blind vehicle service. Using a tool to remove may scratch and damage sealing surface." (General Motors Champion-Racor Technical Comparison, Champion Lip Seal Capture Design). Racor criticized Champion's tap cap design, stating, "Racor has determined that the o-ring gland depth is too deep, allowing the o-ring to sit too low in the gland, and the tap cap to bottom out on the head. This creates the possibility of low o-ring compression and leaks." (General Motors Champion-Racor Technical Comparison, Champion Tap Cap Design). With respect to Champion's rolled can design, Racor stated that the, "Metal forming over the tap cap ribs are very sharp, which creates many stress points prone to vibration wear and leaking. Design may be vulnerable to impact." (General Motors Champion-Racor Technical Comparison, Champion Rolled Can Design Weakness). Lastly, Racor stated that Champion's float switch thread rings were "oversized" and

"out of tolerance," which could lead to a "massive fuel leak." (General Motors Champion-Racor Technical Comparison, Champion Float Switch Thread Ring Tolerance).

After Racor emailed GM the presentation on March 2, 2007, its engineers continued to test the fuel filters. Stone emailed Sabo to warn him that the testing results Sabo provided to GM are based on tests run on Wix filters, not Champion filters and, "If these are supposedly the same elements [filters], we saw far different results later in the day on Champion marked ones." (Pl.'s Resp. Ex. JJ, Email from Stone to Sabo, 3/2/07). In a different email, sent on March 2, 2007, Stone told Sabo that, "It was dangerous to give GM these first day test results without us having an idea of the limitations of our test method and understanding the implications relative to our initial DMAX filter." (Pl.'s Resp. Ex. KK, Email from Stone to Sabo, 3/2/07). Four days later, on March 6, 2007, Stone emailed the gravimetric single pass test results to the Racor group working on this project. (Pl.'s Resp. Ex. LL, Email from Stone to Hardison, et al., 3/6/07). Stone stated, "From these data it appears that the Racor and Champion elements are fairly indistinguishable in terms of gravimetric efficiency." (Email from Stone to Hardison, et al., 3/6/07). The next day, Hardison sent an email to Sabo reiterating that the gravimetric results were "consistent but not in anyone's favor," and "[t]he impact tests were not much better." (Pl.'s Resp. Ex. D, Email from Hardison to Sabo, 3/7/07). Hardison also noted that none of the fuel filters leaked during testing. (Email from Hardison to Sabo, 3/7/07). Hardison then suggested, "[t]he best that can be done is to cast doubt based on the construction and be vague on the high efficiency performance." (Email from Hardison to Sabo, 3/7/07).

In the face of these test results and conclusions by the Racor engineers, Racor made its on-site presentation to GM on March 7, 2007. The March 7, 2007, presentation was much more

detailed than the March 2, 2007 presentation Racor emailed GM.  Racor highlighted its long-term and fruitful relationship with GM, noting, in particular, that Racor helped GM solve its Duramax engine warranty issues by developing a Duramax fuel filter that could filter out contaminates smaller than four microns.  (Pl.'s Resp. Ex. G, General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Warranty Problems Rise over Injector failures).  Racor emphasized that GM did not notify Racor of its decision to make Champion its aftermarket supplier, and did not give Racor an opportunity to respond to the change, even though Racor absorbed all the tooling costs related to producing the filter. (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Fast forward 18 months later).  Racor further asserted that the "will-fit" element was infringing on Racor's patents, stated that Racor has filed legal actions against Champion and other competitors for patent infringement, and asked GM "How does GM support patent infringement?"  (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Fast forward 18 months later).  Racor questioned the Champion filter's ability to withstand impact in crash testing and stated that in previous tests "competitive product failed and leaked fuel, posing a significant safety hazard." (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Fast forward 18 months later).  Racor also incorporated the technical comparison presentation that it emailed to GM on March 2, 2007, into the March 7, 2007, presentation, with some modifications.  (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, General Motors Corporation Champion-Racor Technical Comparison).  Notably, Racor expanded on the simulated impact test results, stating that neither filter leaked during testing.  (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Champion Rolled Can Design Weakness: Simulated Impact Test Results).

After Racor made its presentation to GM, GM SPO employee Mark Leech emailed the March 2, 2007, presentation to JonCarlo Mancini, Champion's GM account representative. (Pl.'s Resp. Ex. OO, Mancini Dep. 55). Mancini reviewed the presentation with Champion engineers, and Champion engineers tested the Racor and Champion filters using all the tests Racor used in the March 2, 2007, presentation, except for the gravimetric test. (Mancini Dep. 55-57; Pl.'s Resp. Ex. RR, Champ's Response). Champion then prepared and presented a response to GM, using its test results to contradict Racor's technical data. (Pl.'s Resp. Ex. RR, Champ's Response). Champion presented to GM on May 1, 2007.

Based on the March 2, 2007, Racor presentation it received from GM, Champion, on June 11, 2007, filed a complaint in this Court alleging the following causes of action:

Count I: Violation of the Lanham Act (15 U.S.C. § 1125(a)(1))
Count II: Trade Disparagement
Count III: Business Defamation
Count IV: Interference with Contractual Relations

On July 13, 2007, Racor wrote to GM to "clarify and supplement" its March presentations. (Pl.'s Resp. Ex. GG, Ltr. from Dinges to Billbrough, 7/13/07). Racor noted that Champion did not have the March 7th presentation before it initiated the lawsuit, and Champion based its claims of inaccurate information on the March 2nd presentation, which was less detailed. (Ltr. from Dinges to Billbrough, 7/13/07). Racor admitted, however, that in reviewing the March 2nd presentation, Racor decided that it may have overstated certain points. (Ltr. from Dinges to Billbrough, 7/13/07). Racor went on to clarify the following points:

- "In the initial gravimetric test, a Champion filter was not readily available and the test was conducted on a Wix-brand filter. Through close inspection, Racor believed that the Wix filter was from the same manufacturer as the Champion filter and

8

therefore would have the same characteristics.  The gravimetric test as reported in the presentations showed that the Racor-manufactured filter performed marginally better than the Wix filter (again, incorrectly identified in the presentation as a Champion filter). . . .Also, subsequent and repeated test results on actual Champion-brand filters show that these filters are also relatively comparable to the Racor filter."

- Racor requested that GM disregard the gravimetric test as a basis for making its sourcing decision because it is difficult to run accurately on a repeated basis.

- Racor quantified its statement that the Champion lip seal "almost always" remains fixed to the mounting head during filter removal as occurring in 19 out of 32 cases.

- The Champion filter can be screwed on without the tap cap bottoming out.

- The impact testing, in which Racor reported that the Champion filter heads cracked, was a series of impact tests and, "upon further review, it appears that this was most likely due to material fatigue from a number of impact tests being conducted on Champion elements attached to the head."

(Ltr. from Dinges to Billbrough, 7/13/07).

The clarification letter did not sway GM from awarding Racor the aftermarket business.  On November 7, 2007, GM SPO notified Champion that Champion would no longer be the supplier for the aftermarket fuel filters.  (Def.'s Mot. Ex. U, Email from Billbrough to Phillips, 11/7/07).  GM SPO told Champion that engineering made the final decision to go back to Racor "due to unknown validation risks and the past issues we have had on this product they determined that it is too much of a risk to continue with the Champ design."  (Email from Billbrough to Phillips, 11/7/07).  Emails

9

between Champion employees reveal that it also learned that GM went back to Racor, in part, "due to the advice of GM Legal due to GM's lawsuit against Bosch that will begin in the near future." (Def.'s Mot. Ex. V, Email from Phillips to Starring, 11/19/07).

John Gaither, Champion's corporate designee for this lawsuit, testified that he did not know whether GM believed the Racor presentation. (Def.'s Mot. Ex. J, Gaither Dep. 103). When asked by defense counsel, "Have you ever been told that one of the reasons Racor got the business back was, in partial, a return for a commitment to pursue coalescer technology in the future?" Gaither replied, "I don't recall that, but it certainly looks like that." (Gaither Dep. 129-30). Gaither further testified that he did not know of any other documents or statements, other than the emails discussed above, from GM explaining why it chose to return the filter business to Racor. (Gaither Dep. 158-59). Neither Champion nor Racor has deposed GM in this lawsuit.

Champion lost 60-80% of its Duramax fuel filter business as a result of GM's decision; it did, however, retain 20-45% of its fuel filter business with GM. (Def.'s Mot. Ex. AA, Gibbons Dep. 70).

Presently before this Court is Defendant Racor's motion for summary judgment.

## II. STANDARD OF REVIEW

The United States Court of Appeals for the Sixth Circuit has summarized the legal standard for summary judgment motions as follows:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

## III. ANALYSIS

### A. False Advertising: Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

Racor first argues that it is entitled to summary judgment because Champion cannot show that there is a causal link between the allegedly false statements and GM's decision to return the Duramax fuel filter aftermarket business to Racor. (Def.'s Mot. 11). Champion responds that it is entitled to a presumption of causation and harm, which is sufficient to survive summary judgment. (Pl.'s Resp. 16-17).

The relevant section of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
> ***
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To state a cause of action for false or misleading advertisement under 15 U.S.C. § 1125(a)(1)(B), a plaintiff must establish that: "1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff. *American Council of Certified Podiatric Physicians and*

11

*Surgeons v. American Bd. of Podiatric Surgery, Inc.*, [hereinafter *Podiatric Physicians*] 185 F.3d 606, 613 -614 (6th Cir. 1999) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922-23 (3d Cir. 1990); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990)). "The third and fifth elements-deception and injury-are both components of causation generally. The deception element asks whether the defendant's misstatements caused the consumer to be deceived. The injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff. The sort of proof of these elements a plaintiff must show varies depending upon whether damages or injunctive relief is sought." *Id.*

In cases in which the plaintiff seeks to recover monetary damages, such as the case here, the plaintiff "may show either that the defendant's advertisement is literally false or that it is true yet misleading or confusing." *Podiatric Physicians*, 185 F.3d at 614. If the plaintiff proves that the statements made were literally false, the plaintiff prevails without evidence that the statements actually misled consumers because actual deception is presumed. *Id.* "Where statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (i.e., evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product)." *Id.* A plaintiff relying challenging statements that are literally true yet misleading "'cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react.'" *Id*. (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir. 1990)).

Champion alleges that Racor made false statements about the Champion filter to GM (Compl. ¶ 84), and for purposes of this argument, Racor assumes that Champion can show that the statements were false (Def.'s Mot. 16-17). Consequently, under Sixth Circuit precedent, literally

false statements do not require proof that statements caused the consumer to be misled because actual deception is presumed. *Podiatric Physicians*, 185 F.3d at 614.

The actual deception presumption was also endorsed by the United States Court of Appeals for the Eighth Circuit in *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329 (8th Cir. 1997). In *Porous Media*, the Eighth Circuit considered whether the presumption of actual deception, upon a showing of literally false statements, should be applied in comparative advertising cases where the plaintiff-competitor's product is specifically referenced or compared, such as the case presented here. 110 F.3d at 1335. The Court concluded that such a presumption should be applied, but held that the presumption was rebuttable if the defendant can show that it did not cause monetary damage to the plaintiff. *Id.* at 1336.

> A predicate finding of intentional deception as a major part of the defendant's marketing efforts, contained in comparative advertising, encompasses sufficient harm to justify a rebuttable presumption of causation and injury in fact. Once it had established its claim, Porous still bore the burden of proving an evidentiary basis to justify any monetary recovery. These instructions, properly reconciled, balanced a recognition of the basic harm to a plaintiff who is targeted by deliberately deceptive comparative advertising with the statutory requirement that any monetary recovery under the Lanham Act must represent compensatory damages shown to have been caused by the defendant.

*Id.* at 1336.

Racor's reliance on *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996), is misplaced, insofar as Racor concedes for the purposes of this motion that Champion can show that the challenged statements are false. In *Seven-Up*, the United States Court of Appeals for the Fifth Circuit affirmed the magistrate judge's order granting Coca-Cola's motion for judgment as a matter of law. 86 F.3d at 1387. In so doing, the Court noted that Seven-Up did not present any direct evidence that the decisionmakers relied on or was influenced by any of the material in the Coca-Cola

13

presentation in deciding to distribute Sprite instead of Seven-Up.  *Id.*  "Instead, Seven-Up argues that the inference to be drawn from the fact that the board witnessed the presentation and then, immediately or within a short period of time, decided to switch soft drinks provides substantial evidence, on its own, to support the jury's verdict on causation."  *Id.* at 1387.  The Court rejected Seven-Up's argument explaining, "We have previously rejected inferences of causation based on the chronology of events, where the record contains undisputed testimony to the contrary or other equally credible theories of causation."  *Id.* at 1388.

Although *Seven-Up* is factually similar to this case in that Champion has not presented any direct evidence that GM was influenced by Racor's presentation, *Seven-Up* is legally distinguishable because the Fifth Circuit either does not have or did not invoke the presumption that actual deception is presumed when the challenged statements are literally false.  Because Racor concedes for the purposes of this argument that the statements are false, actual deception is presumed, and Champion does not have establish a casual link between Racor's presentation and the harm to Champion.  Accordingly, Racor is not entitled to summary judgment on this ground.

Racor next argues that it is entitled to summary judgment on Champion's Lanham Act claim because Racor's presentation was not "commercial advertising or promotion" as contemplated by the statute because the presentation was not sufficiently disseminated to the purchasing public. (Def.'s Mot. 14).  Champion responds a single statement, statements made to only one customer, and statements made during private conversations may constitute actionable commercial advertising or promotion.  (Pl.'s Resp. 13).

The Lanham Act prohibits false or misleading statements in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). "Commercial advertising or promotion" under the Lanham

14

Act is defined as:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Int'l Technologies Consultants, Inc. v. Stewart*, No. 07-13391, slip op. at 6, 2008 WL 4378095 (E.D. Mich. Sept. 23, 2008)( Cook, J.) (citing *White Mule Co. v. ATC Leasing Co.*, 540 F.Supp.2d 869, 897 (N.D. Ohio 2008). Racor contests only the fourth element of the commercial advertising or promotion test, i.e. whether the speech was sufficiently disseminated to the relevant purchasing public. Racor argues that misrepresentations to a single customer in the context of negotiations does not constitute "advertising" or "promotion." (Def.'s Mot. 15).

In *Seven-Up*, the Fifth Circuit recognized that the required level of dissemination and relevant consumption by consumers will vary by industry. 86 F.3d at 1385. The Court further stated that when the pool of potential purchases in a market is relatively small, "even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act." *Id.* The Court ultimately held that Coco-Cola's presentation, titled "The Future Belongs to Sprite," which was shown to eleven bottling companies, out of a possible seventy-four, constituted "advertising" or "promotion" within the soft drink industry. *Id.* at 1386-87.

Judge Cook applied the *Seven-Up* principles in *Int'l Technologies*, holding that two letters the defendant sent to the customer and its financing company constituted advertising or promotion to the relevant purchasing public because the relevant industry, float glass plants, was very small. Slip op. at 7.

In the present case, the market for Duramax fuel filters, designed specifically for GM, is

relatively small. In fact, as argued by Champion, "GM is the market for this part." (Pl.'s Resp. 14). This Court agrees. The "relevant purchasing public" for this part is GM. As a result, the presentation Racor gave to GM, in an admitted effort to sway GM to choosing its product over Champion's, was a promotional presentation that triggered the protections of the Lanham Act. *See Seven-Up*, 86 F.3d at 1385.

Defendant Racor's reliance on *Johnson Controls v. Exide Corp.*, 152 F.Supp.2d 1075 (N.D. Ill. 2001), is unavailing. In *Johnson Controls*, the parties both bid on a contract to supply automotive batteries to Sears. 152 F.Supp.2d at 1077. The defendant alleged that in the bidding process, the plaintiff made misrepresentations about its products capabilities. *Id.* The United States District Court for the Northern District of Illinois held that the presentation was not sufficiently disseminated because only Sears saw the presentation. *Id.* at 1082.

Unlike in the present case, the market in *Johnson Controls* for automobile batteries was relatively large. Here, Champion argues that the market at issue is very small and discrete, namely GM's aftermarket business, which is funneled through SPO. Racor argues that the market also includes the other aftermarket retailers Champion sold its filters to, such as Pep Boys. If the jury finds that the market is made up solely of GM, by showing the presentation to GM, Racor arguably sufficiently disseminated the presentation in the market. *See e.g., Seven-Up*, 86 F.3d at 1386. ("Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."). Thus, there is a question for the jury as to whether Racor's statements were made for commercial promotion. Accordingly, Racor is not entitled to summary judgment on Champion's Lanham Act claim for insufficient dissemination.

16

Next, Racor argues that Champion cannot prove that the challenged statements are actionable, i.e. statements of fact and not opinion. (Def.'s Br. 17). Champion contends that Racor's false statements were not opinion. (Pl.'s Resp. 15-16).

A Lanham Act claim must be based on a statement of fact and not opinion. *Podiatric Physicians*, 185 F. 3d at 614. To decide whether the statements were statements of fact or opinion, the Court must evaluate the statements within context. *Id.*

Champion challenges the following statements from Racor's March 2, 2007, presentation:

1) "Racor stated that this testing [gravimetric testing] show the Champion filter to have 'significantly lower efficiency removing critical particles less than 4 micron size . . .' as compared to the Racor filter." (Compl. ¶ 47).

2) "Racor stated that Champion's '[l]ip seal almost always remains in the head, stuck on the spud' and that Champion's filter 'is difficult to remove, specially in blind vehicle series'. . . and the design . . . 'may' allow the tool to scratch and damage the sealing surface." (Compl. ¶ 53).

3) "According to Racor, the depth of the gland between the filter's outer shell and plate where the o-ring sits is too deep. Racor speculated that, as a consequence, Champion's filter might 'bottom out' and create the possibilities of leaks. Racor claimed that it would have rejected Champion's filter due to this defect." (Compl. ¶ 56).

4) With respect to the fluted roll can design, "Racor stated that . . . Champion's design results in very sharp edges and causes 'many stress points' prone to vibration, wear, and leaks. Racor also state that Champion's design leaves the filter 'vulnerable to impact.'" (Compl. ¶ 64).

5) "Racor stated that the threads to the port on the Champion filter are 'oversized' and 'out of tolerance.' Racor therefore misled GM by stating that Champion's design could result in a 'massive fuel leak.' It also stated that the 'oversized threads' on the Champion element could allow 'the float switch to disengage from the element, especially in case of impact.'" (Compl. ¶ 68).

Racor argues, "All of these statements relate to asserted structural deficiencies in Champion's product, and many of the statements contemplate potential problems that may be associated with the

17

structural deficiencies." (Def.'s Mot. 18). Based on this statement, it is clear that Racor has confused the meaning of "opinion" with that of speculation about future events based on factual statements. Racor's statements assert facts, purportedly based on its testing of the two products. Racor asserted test results and observations, and drew factual conclusions from the test results and observations. The presentation was based on and contained data gleaned from comparison testing of the two filters; it did not merely contain the personal beliefs of Racor's sales or engineering teams about the superiority of the Racor filter. Moreover, Racor does not sufficiently explain why the challenged statements are opinions and not facts. Pointing out that Racor speculated about the problems GM might incur if it used the Champion filters is not enough to show that the statements were opinion. Accordingly, this Court concludes that Racor has not shown that the statements were opinion, as a matter of law.

Racor's fourth, and final, argument, with respect to Champion's Lanham Act claim, is that this Court should grant summary judgment because Champion cannot prove that any of the statements were literally false, or that the statements were sufficiently misleading so as to deceive GM. (Def.'s Mot. 18). Champion did not directly respond to this argument, but did argue that there is sufficient proof that Racor deceived GM to survive summary judgment. (Pl.'s Resp. 18).

The emails from Racor engineers after the March 2, 2007, presentation was emailed to GM but before the presentation was made on March 7, 2007, and the letter Racor wrote to GM after this lawsuit was filed, undercut Racor's assertion that none of the statements were literally false or misleading.

On March 2, 2007, Stone emailed Sabo to warn him that the testing results Sabo provided to GM were based on tests run on Wix filters, not Champion filters and, "If these are supposedly the

18

same elements [filters], we saw far different results later in the day on Champion marked ones."
(Pl.'s Resp. Ex. JJ, Email from Stone to Sabo, 3/2/07).  In a follow up email, sent on March 2, 2007,
Stone told Sabo that, "It was dangerous to give GM these first day test results without us having an
idea of the limitations of our test method and understanding the implications relative to our initial
DMAX filter."  (Pl.'s Resp. Ex. KK, Email from Stone to Sabo, 3/2/07).  With respect to the
gravimetric single pass test results Stone stated, "From these data it appears that the Racor and
Champion elements are fairly indistinguishable in terms of gravimetric efficiency."  (Pl.'s Resp. Ex.
LL, Email from Stone to Hardison, et al., 3/6/07) (Email from Stone to Hardison, et al., 3/6/07).  The
next day, Hardison sent an email to Sabo reiterating that the gravimetric results were "consistent but
not in anyone's favor," and "The impact tests were not much better."  (Pl.'s Resp. Ex. D, Email from
Hardison to Sabo, 3/7/07).  Hardison also noted that none of the fuel filters leaked during testing.
(Email from Hardison to Sabo, 3/7/07).

        In its July 13, 2007, letter to GM, Racor asked GM to disregard the gravimetric test results,
quantified its statement that the Champion lip seal "almost always" remains fixed to the mounting
head during removal, stated that the Champion filter can be screwed on without the tap cap
bottoming out, and corrected its statement that Champion filter heads cracked on impact.
(Pl.'s Resp. Ex. GG, Ltr. from Dinges to Billbrough, 7/13/07).

        Viewing the evidence in the light most favorable to Champion, the non-moving party, this
Court finds that Champion presented evidence that a jury could use to conclude that Racor made
statements to GM that were literally false.  Racor's engineers, and then Racor itself, contradicted
the "results" and "data" contained in the presentation in inter-office emails and in the letter Racor
wrote to GM.  This evidence shows that there is a question regarding whether Racor's statements

19

are literally false or were just misleading.

**A.  Trade Disparagement/Injurious Falsehood**

Racor argues that Champion cannot prevail on its claim for trade disparagement (a.k.a. injurious falsehood) because it cannot present sufficient evidence establishing a causal link between the alleged disparaging statements and GM decision to go back to Racor.  (Def.'s Mot. 19).  Champion responds that it has presented sufficient proof of trade disparagement to survive summary judgment, but Champion did not address the casual link argument.  (Pl.'s Resp. 20).

The Michigan Court of Appeals recognized injurious falsehood as a cause of action in Michigan in *Kollenberg v. Ramirez*, 127 Mich. App. 345, 339 (1983).  In so doing, the Michigan Court of Appeals adopted the elements of injurious falsehood set forth in the Restatement (Second) of Torts. Under the Restatement:

> [o]ne who publishes a false statement harmful to the interests of another is subject
> to liability for pecuniary loss resulting to the other if:
> (a) he intends for publication of the statement to result in harm to interests of the
> other having a pecuniary value, or either recognizes or should recognize that it is
> likely to do so, and
> (b) he knows that the statement is false or acts in reckless disregard of its truth or
> falsity.

Restatement (Second) of Torts, § 623A (1977).

In order to prevail on its injurious falsehood claim, Champion must show that Racor's statements were false, Racor knew of or recklessly disregarded the falsity, Racor intended for the publication to result in pecuniary harm to Champion, and pecuniary loss resulted from the false statement. *Kollenberg*, 127 Mich. App. at 339.  Racor contests only that Champion will not be able to prove the last element: pecuniary loss resulted from the false statement.

Because there is no presumption of injury if the statements are proven to be actually false, and there is no evident that GM relied on Racor's presentation in making its decision, Champion must rely solely on the time that lapsed between the presentation and the decision. GM did not formally notify Champion that it would not continue to buy its filters until November 7, 2007, which is eight months after the March 7, 2007, presentation. Nonetheless, Champion has presented evidence that GM made its decision much earlier than November 7, 2007; Mancini testified that the decision had been in the works for several months, and Racor knew that it was getting business back because it spent five or six months in preparation with its supply chain. (Mancini Dep. 105). Nonetheless, the inference that can be drawn from the lapse of time between the presentation and the decision is not sufficient to show that GM's decision was a result of the allegedly false statements Racor made in its presentation. Absent evidence that GM premised its decision on the basis of presentation, Champion cannot show that its pecuniary loss resulted from the allegedly false statements. Champion, therefore, has not presented sufficient evidence to survive summary judgment; Racor's summary judgment motion on Champion's trade disparagement claim is granted.

## B. Business Defamation

Racor argues that Champion's business defamation claim cannot survive summary judgment because Champion cannot prove that Racor's statements tended to prejudice Champion in its business dealings or deterred others from dealing with it. (Def.'s Mot. 19). Champion again contends that it has presented sufficient evidence to survive summary judgment. (Pl.'s Resp. 20).

In order to prevail on a defamation claim, the plaintiff must prove the following four elements: "1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher,

and 4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication (defamation per quod)." *Frohriep v. Flanagan (On Remand)*, 278 Mich. App 665, 684 (2008). A corporation may assert a defamation action if "the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it." *Northland Wheels Roller Skating Center, Inc v Detroit Free Press, Inc*, 213 Mich. App 317, 328 (1995), quoting *Heritage Optical Center, Inc v. Levine*, 137 Mich. App 793, 797 (1984).

Again, because Champion has not presented direct evidence or persuasive circumstantial evidence that Racor's allegedly false statements prejudiced it in the conduct of its business with GM or deterred GM from dealing with it, Champion's business defamation claim must be dismissed. This is particularly true when Racor has presented evidence that GM returned its fuel filter business to Racor because the Champion filter had not been validated, (Def.'s Mot. Ex. U., Email from Billbrough to Phillips, 11/7/07), and, "due to the advice of GM Legal due to GM's lawsuit against Bosch that will begin in the near future." (Def.'s Mot. Ex. V, Email from Phillips to Starring, 11/19/07). Summary judgment is, therefore, entered on Champion's business defamation claim.

### C. Interference with Contractual Relations

Lastly, Racor argues that it is entitled to summary judgment on Champion's interference with contractual relations claim because no breach of contract occurred. (Def.'s Mot. 20). Champion did not respond to this argument.

The elements of tortious interference with a contract are: 1) the existence of a contract; 2) a breach of the contract; and 3) an unjustified instigation of the breach by the defendant. *Health Call of Detroit v. Atrium Home & Health Care Services, Inc.*, 268 Mich. App. 83, 89-90 (2005).

22

Champion has presented no evidence of a breach of contract. In fact, Champion does not even allege a breach of contract in its complaint. Rather, Champion states, "Racor's intentional misleading and false statements have interfered with Champion's relationship with GM and have caused this relationship to be less economically advantageous and caused other injuries to Champion." (Compl. ¶ 107). Because Champion does not even allege, much less provide proof of a breach of contract, and there is evidence that Champion continues to supply some fuel filters to GM, Champion's interference with contractual relations claim fails as a matter of law. This Court, therefore, grants Racor's motion for summary judgment on this claim.

## IV. CONCLUSION

For the reasons discussed above, the Court:

1) **DENIES** Racor's motion for summary judgment on Plaintiff's Lanham Act claim;

2) **GRANTS** Racor's motion for summary judgment on Plaintiff's trade disparagement, business defamation and interference with contractual relations claims.

SO ORDERED.


S/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 30, 2009

23

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 30, 2009.

S/Denise Goodine
Case Manager